# EXHIBIT B

| 89TH CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPORT<br>No. 1366 |
|---|---|---|

# FAIR LABOR STANDARDS AMENDMENTS OF 1966

MARCH 29, 1966.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. POWELL, from the Committee on Education and Labor, submitted the following

## REPORT

[To accompany H.R. 13712]

The Committee on Education and Labor, to whom was referred the bill (H.R. 13712) to amend the Fair Labor Standards Act of 1938 to extend its protection to additional employees, to raise the minimum wage, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment strikes out all after the enacting clause and inserts in lieu thereof a new text which appears in the reported bill in italic type.

### INTRODUCTORY STATEMENT

The Fair Labor Standards Act of 1938 was enacted on June 25, 1938. It is a forerunner to today's war on poverty. The basic policy of that Act is contained in its second section:

#### FINDING AND DECLARATION OF POLICY

> SEC. 2. (a) The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5)

However, an independently owned retail or service establishment will not lose its status as a separate and distinct entity because it occupies premises leased to it by a person who also leases premises to other retail or service establishments, or by reason of an arrangement which includes an agreement that it (1) will sell, or sell only, certain goods specified by a particular manufacturer, distributor, or advertiser; (2) will join with other such establishments in the same industry for the purpose of collective purchasing; or (3) will have the exclusive right to sell the goods or to use the brand name of a manufacturer, distributor, or advertiser within a specified time.

In keeping with the broad statutory definitions of the coverage phrases used, the courts have repeatedly expressed and adhered to the principle that the coverage phrases should receive a liberal interpretation, consonant with the definitions, with the purpose of the Act, and with its character as remedial and humanitarian legislation.

However, despite the Act's broad coverage terms and the courts' liberal interpretations regarding coverage and restrictive interpretations regarding exemptions, there is great need for extending the present coverage of the Act to large groups of workers whose earnings today are unjustifiably and disproportionately low. There is a significant correlation between poverty earnings and exclusion from the protective provisions of the Act. Among family heads employed in industries generally covered by the Act, only 5 to 10 percent had annual incomes under $3,000 in 1963. The figure is 8 to 14 percent in industries where there is partial coverage of the Act. But in industries where there is little or no coverage, the proportions jumped to 33 and 49 percent, respectively.

Also, it is imperative, if the Act is to have real meaning, that the minimum wage provide earnings above the poverty level. It is a shocking fact that demands immediate remedy that 40 percent of all children living in poverty were in families where there was a worker who had a full-time job throughout the year. Full employment, and equal employment opportunity, are now widely endorsed objectives, but to be employed equally at substandard wages is no social achievement at all. The "minimum standard of living necessary for health, efficiency, and general well-being of workers" must be attained.

The Act was a commitment to improve living standards by eliminating substandard working conditions in employment, subject to the Federal jurisdiction over interstate commerce. That commitment, incomplete when it was made, has become less complete with the passage of years. The law has not been kept in line with the advancing economy and some of its guarantees mean less comparatively than they did 28 years ago. The Fair Labor Standards Amendments of 1966 are intended to rectify this situation with all deliberate speed consistent with the policy of the Act and the welfare of the American people.

BRIEF SUMMARY OF PROVISIONS

*Title I—Definitions*

Section 101. *Tips.*—Provides that the wage paid by an employer to a tipped employee shall be deemed to be increased on account of tips by an amount determined by the employer, but such amount shall not exceed 35 percent of the applicable minimum wage rate during the first 2 years from the effective date of the Fair Labor Standards Amendments of 1966, 40 percent during the third and

fourth years, and 45 percent thereafter. Directs the institution of a procedure for reconsideration of the amount attributed as tips upon appeal by the employee.

Defines "tipped employee" as an employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips.

Section 102. *Definition of enterprise.*—Amends definition of "enterprise" and "employer" to include public and private, proprietary and nonproprietary hospitals (excluding Federal Government hospitals) and related institutions and, also, institutions of higher education regardless of whether or not such institutions are public or private or operated for profit or not for profit. Further amends definition of "enterprise" and "employer" to include public and private transit systems.

Also amends the definition of an "enterprise engaged in commerce or in the production of goods for commerce" to include an enterprise which has employees engaged in commerce or in the production of goods for commerce and which (1) during the period February 1, 1967, through January 31, 1969, has an annual gross volume of sales of not less than $500,000, or is a gasoline service establishment with an annual gross volume of sales of not less than $250,000, (2) beginning February 1, 1969, has an annual gross volume of sales of not less than $250,000, (3) is a laundry or drycleaning enterprise or a construction enterprise, or (4) is a hospital, nursing home, institution of higher education, or other related institution (regardless of whether or not such hospital, institution or school is public or private or operated for profit or not for profit). There is no dollar volume test for the following types of enterprises: laundries, drycleaning, construction, educational, or hospital, nursing home, and similar institutions. "Mom and pop" establishments remain excluded. Individual retail or service establishments meeting the percentage tests in section 13(a)(2) and with annual sales of less than $250,000 remain excluded under section 13(a)(2) of the Act.

Section 103. *Agricultural employees.*—Excludes from definition of employee, for the purpose of computing "man-days" of agricultural labor, "the parent, spouse, child, or other member of the agricultural employer's immediate family," and "any individual who is employed by an employer engaged in agriculture if such individual (*a*) is employed as a hand harvest laborer and is paid on a piece-rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece-rate basis in the region of employment, (*b*) commutes daily from his permanent residence to the farm on which he is so employed, and (*c*) has been employed in agriculture less than 13 weeks during the preceding calendar year." Defines "man-day" to mean any day during which an employee performs agricultural labor for the employer.

*Title II—Revision of exemptions*

Section 201. *Hotel, restaurant, and recreational establishments; hospitals and related institutions.*—Repeals the minimum wage exemptions for such establishments (except seasonal recreational and amusement establishments). Maintains overtime exemptions for such establishments (except hospitals and related institutions).

Exempts any employee employed by any retail or service establishment (but not employees of laundries or drycleaning establishments

commissions without regard to whether they exceed the draw or guarantee.

*Title V—Students and management trainees*

Section 501. *Students and management trainees.*—Amends full-time student provision to provide for the employment of full-time students regardless of age (but in compliance with the applicable child labor laws) outside of their school hours in retail or service establishments or in agriculture at not less than 85 percent of the minimum wage in full-time positions during school vacations or in part-time positions not to exceed 20 hours in any workweek under certificates issued by the Secretary.

Limits number of students to be hired at subminimum wages in retail or service establishments to the proportion of hours of student employment to total employment in the establishment or similar establishments prior to the 1961 amendments.

Provides an overtime exemption for the employment of management trainees in retail or service establishments limited to 18 months per trainee if such training is for an administrative or executive position and the trainee receives not less than 1½ times the applicable minimum wage for hours worked in excess of 40 in any workweek and the trainee is not employed for more than 48 hours in any workweek.

A limitation of 1 trainee to an establishment with 50 or fewer employees or a number of trainees equal to a maximum of 3 percent of the total number of employees in an establishment with more than 50 employees is provided.

Further provides that no employer shall be required to pay in excess of 75 percent of the applicable minimum wage to any employee under the age of 21 years during the first 6 weeks of full-time employment of such employee's employment career.

*Title VI—Statute of limitations and effective date*

Section 601. *Statute of limitations.*—Maintains 2-year statute of limitations, except in the case of a willful violation where a 3-year statute of limitations is provided.

Section 602. *Effective date.*—The amendments made by this Act shall take effect on February 1, 1967. On and after the date of the enactment of this Act the Secretary is authorized to promulgate necessary rules, regulations, or orders with regard to the amendments made by this Act.

Section 603. *Study of excessive overtime.*—The Secretary is instructed to study present practices dealing with overtime work and to report to the Congress by July 1, 1967.

COMMENTS ON MAJOR PROVISIONS

The bill would extend the coverage of the Fair Labor Standards Act to approximately 7.2 million additional workers. This is accomplished without departing from the Act's basic coverage concepts: employment in "commerce" or in the "production of goods for commerce." Employees individually engaged in "commerce" or in the "production of goods for commerce," unless specifically exempted, would continue to enjoy the protection of the Act. The additional coverage has been secured through two primary approaches. First, certain definitions, most importantly, "enterprise engaged in commerce or in the production of goods for commerce," have been rede-

fined to extend coverage. Second, several exemptions in the present law have been repealed so as to narrow the Act's exclusions.

TABLE 5.—*Estimated distribution of nonsupervisory employees who would be brought under minimum wage protection of the Act in 1967 and 1969 by the bill* [1]

[In thousands]

| Industry | Employees added to minimum wage coverage | | | Total employees subject to minimum wage provisions |
|---|---|---|---|---|
| | 1967 | 1969 | Total | |
| Retail trade | 1,155 | 345 | 1,500 | 4,086 |
| Restaurants | 300 | 125 | 425 | 432 |
| Hotels and motels | 240 | 35 | 275 | 275 |
| Hospitals and related institutions | 1,471 | ------ | 1,471 | 1,471 |
| Miscellaneous services | 20 | 30 | 50 | 349 |
| Laundries | 505 | ------ | 505 | 523 |
| Agriculture | 485 | ------ | 485 | 485 |
| Transit systems | 60 | 5 | 65 | 65 |
| Agriculture in area of production | 90 | ------ | 90 | 90 |
| Taxicabs | 75 | 25 | 100 | 100 |
| Logging | 37 | ------ | 37 | 37 |
| Cotton ginning | 34 | ------ | 34 | 34 |
| Construction | 581 | ------ | 581 | 2,994 |
| Federal Government | 665 | ------ | 665 | 665 |
| All other industries | 570 | 390 | 960 | 25,230 |
| Total | 6,288 | 955 | 7,243 | 36,836 |

[1] Based on estimated employment in 1964.

NOTE.—These estimates do not reflect coverage of employees of employers providing contract services for the United States.

*Enterprise*

Section 3(s) of the Act presently provides that an enterprise will be considered to be engaged in commerce or in the production of goods for commerce if it has employees engaged in such activities, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce if (1) it is a million dollar retail or service enterprise; (2) it is a million dollar local transit enterprise; (3) it is an establishment of any other million dollar enterprise; (4) it is engaged in construction or reconstruction, or both, with an annual business volume of not less than $350,000; or (5) it is a gasoline service establishment with sales of not less than $250,000. There is a proviso that if the only employees of an establishment are the owner or his parent, spouse, or child, such establishments will not be considered a covered enterprise, nor will its volume of business be included in the sales volume of any enterprise.

"Enterprise engaged in commerce or in the production of goods for commerce" is amended to mean an enterprise which has employees engaged in commerce or in the production of goods for commerce, which shall include employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce, if—

(1) During the period February 1, 1967, through January 31, 1969, such enterprise has an annual gross volume of sales made or business done of not less than $500,000, or is a gasoline service establishment with an annual gross volume of sales of not less than $250,000;

(2) During the period commencing February 1, 1969, such enterprise has an annual gross volume of sales made or business done of not less than $250,000;

(3) Such enterprise is engaged in laundering or cleaning services;

(4) Such enterprise is engaged in construction or reconstruction; or

(5) Such enterprise is a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution, a school for mentally handicapped or gifted children, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit).

Section 201 of the bill provides that an employee of any retail or service establishment (regardless of whether such establishment is in any such enterprise) which has an annual gross volume of business of less than $250,000 is exempted from coverage by the Act.

If the only regular employees of an establishment are its owner, or his parent, spouse, child, or other immediate member of his family, such establishment will not be considered an enterprise engaged in commerce or in the production of goods for commerce, and the sales of such establishment will not be included in the computation of sales of any enterprise.

The enormous importance of this change in section 3(s) of the Act can be most vividly seen by noting the impact of the change in the dollar-volume test from $1 million to $500,000 on February 1, 1967. By this half a million dollar decrease in the dollar-volume requirement, 2,420,000 employees will be added to minimum wage coverage. The further reduction of the dollar-volume test from $500,000 to $250,000 in 1969 results in minimum wage coverage being extended to an additional 955,000 employees.

In addition to the amendment to section 3(s) of the Act, section 3(r), which defines "enterprise," is amended so as to bring under the coverage of the Act employees of hospitals and related institutions, schools for mentally handicapped or gifted children, or institutions of higher education, regardless of whether any of these hospitals, schools, or institutions are public or private or operated for profit or not for profit. Section 3(r) of the Act is further amended to cover employees of street, suburban or interurban electric railways, or local trolley or motorbus carriers, if the rates and services of these railways or carriers are subject to regulation by a State or local agency, regardless of whether or not such railways or carriers are public or private or operated for profit or not for profit. These enterprises which are not proprietary, that is, not operated for profit, are engaged in

activities which are in substantial competition with similar activities carried on by enterprises organized for a business purpose. Failure to cover all activities of these enterprises will result in the failure to implement one of the basic purposes of the Act, the elimination of conditions which "constitute an unfair method of competition in commerce." Since Federal Government hospitals have wages at levels which are at or above the present minimum wage level, and the committee can be assured that such wage levels will not fall below the statutory minimum, the extension of coverage provided by this bill does not include the employees of such hospitals (except as provided in section 306 of the bill). Even outweighing the consideration of unfair competition between covered and noncovered enterprises were the needs of the employees of these enterprises. A custodial worker in an educational institution is as much in need of a minimum standard of living as a custodial worker in an aircraft plant. A transit worker has the same basic financial needs regardless of whether he works for a taxicab company or a local bus system. A food service employee faces the same cost-of-living problems whether employed by a hospital or a food service contractor. Neither employee should be compelled to subsidize the costs of these services to the consumer. Such institutions are compelled to purchase goods and contract services from employers who must pay the minimum wage. They cannot, in good conscience, deny their own employees this bare minimum. They continue to expand and construct new facilities at the prevailing market costs. They can pay their own employees wages necessary for the maintenance of the minimum standard of living. Because these institutions employ an exceptionally large number of professional employees, it is important to note here that the exemption provided by section 13(a)(1) has not been altered. Among others, bona fide professional, administrative, and executive employees are specifically excluded from the coverage of the Act by that section regardless of the type of enterprise in which they perform their duties.

*Small establishment exemption*

Employees of small retail or service establishments, except laundry and cleaning service employees and employees of hospitals and certain institutions and schools, which have annual dollar volumes of sales which are less than $250,000 and which do more than 50 percent of their business within the State in which they are located, are exempted from the minimum wage and overtime provisions of the Act. This establishment exemption applies to restaurants, retail food service establishments, hotels, motels, amusement or recreational establishments, and other retail or service establishments as defined in the Act.

*Specific categories of employment affected by bill*

TABLE 6.—*Categories of employment to which minimum wage protection has been extended by the bill*

[In thousands]

| Category of employment | Number of employees covered by minimum wage for first time in 1967 or 1969 | Total number of employees covered by 1969 |
|---|---|---|
| Retail trade | 1,500 | 4,086 |
| Restaurants | 425 | 432 |
| Hotels and motels | 275 | 275 |
| Hospitals and related institutions | 1,471 | 1,471 |
| Miscellaneous services | 50 | 349 |
| Laundries | 505 | 523 |
| Agriculture | 485 | 485 |
| Transit systems | 65 | 65 |
| Agriculture in area of production | 90 | 90 |
| Taxicabs | 100 | 100 |
| Logging | 37 | 37 |
| Cotton ginning | 34 | 34 |
| Construction | 581 | 2,994 |
| Federal Government | 665 | 665 |
| All other industries | 960 | 25,230 |
| Total | 7,243 | 36,836 |

Specific categories of employment that will be affected by the committee's bill are as follows:

(1) *Retail trade.*—The broadening of the definition of an enterprise "engaged in commerce or in the production of goods for commerce" contained in section 3(s) of the Act and the repeal or modification of certain exemptions in section 13 will result in the extension of coverage of minimum wage and overtime protection to an additional 1.5 million employees (not including restaurant workers) in retail trade. The bill provides for the repeal of sections 13(a)(19) and 13(a)(20) which provide minimum wage and overtime exemptions to employees of establishments primarily engaged in the business of selling automobiles, trucks, or farm implements and for food service employees in retail establishments. Section 13(b) of the Act is amended to provide an overtime exemption for any salesman, mechanic, or partsman employed by establishments primarily engaged in the business of selling automobiles, trucks, or farm implements to the ultimate purchaser, and for any salesman, mechanic, or flight personnel employed by a nonmanufacturing establishment primarily engaged in selling aircraft. Section 13(b) of the Act is further amended to maintain the overtime exemption for food service employees in retail or service establishments. Approximately 4 percent of the newly covered retail trade employees earn less than $1 an hour.

(2) *Laundries and drycleaning establishments.*—The bill repeals section 13(a)(3) of the Act and amends section 3(s) so as to extend coverage to 505,000 employees in laundering and cleaning establishments. No dollar volume test has been provided. Twenty-two percent of these employees presently earn less than $1 an hour.

(3) *Restaurants.*—Section 13 is amended so as to extend minimum wage protection to 425,000 of the 1,753,000 employees of restaurants. Approximately 12 percent of these employees presently earn less than $1 an hour.

Special provisions are made for employees who receive tips. "Wages" are defined in section 101 of the bill so that the wage paid by the employer to a tipped employee will be deemed to be increased (on account of tips) by an amount determined by the employer, but such amount shall not exceed 35 percent of the applicable minimum wage rate during the first 2 years from the effective date of the Fair Labor Standards Amendments of 1966, 40 percent during the third and fourth years, and 45 percent thereafter.

A "tipped employee" is defined in the bill as any employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips. This is analagous to the reporting requirements for a tipped employee under the provisions of the Social Security Amendments of 1965.

It should also be noted here that at present "wages" include the fair value of board, lodging, and other facilities customarily provided by the employer to his employees.

These provisions resolve the question of whether certain income of an employee from a source other than his employer, but earned while in the employment of such employer, should be considered wages paid by the employer. This proposal reflects the result of considerable deliberation on the basic issue of tips as wages, as well as the difficult problem of how best to calculate the amount of tips. It further reflects the equitable result of discussions with representatives of the industry, both labor and management.

The practical application of the provisions may be seen by example. For instance, assuming the applicable minimum hourly wage is $1, the maximum tip allowance is 35 percent of that amount, or $0.35 per hour. The employer is required to pay the employee a minimum hourly wage of $0.65, assuming the employee comes under the definition of "tipped employee," and further assuming that he received $0.35 or more an hour in tips. The 35-percent credit also applies to the minimum hourly wage of $1.15. When such wage is $1.30 or $1.45 an hour, the applicable tip allowance is 40 percent of the respective amounts. When the wage is $1.60 an hour, the maximum allowance is 45 percent. This means that a maximum of 45 percent of the $1.60 hourly minimum, or $0.72 per hour, may be so credited against the employee's wage. The employer then, must pay the balance of the applicable minimum rate—in this case, $0.88 an hour. All this presumes, however, that the employee is receiving at least the maximum tip credit in actual tips.

If the employee is receiving less than the amount credited, the employer is required to pay the balance so that the employee receives at least the minimum wage with the defined combination of wages and tips.

twice the regular rate of pay for hours worked in excess of 48 in any workweek. With regard to the proposal relating to curtailment of excessive overtime work and the recommendation that the penalty overtime wage rate be increased from 1½ times the regular rate of pay to twice such rate for excessive hours, the committee instructed the Secretary of Labor to study excessive overtime and the extent to which such overtime work impedes the creation of new job opportunities, and to report his findings and recommendations to the Congress. Of particular interest to the committee are the answers to such questions as (1) what is regularly scheduled overtime; (2) what is emergency or unavoidable overtime; (3) is the present penalty rate effective in some industries; (4) to whom would the benefits of higher penalty overtime accrue; (5) how many full-time positions would be created; (6) how much overtime is necessitated by a rapid economic growth which outpaces the ability of industry to expand facilities; (7) how would such a proposal aid the hard-core unemployed, youths, minorities, the aged, and the unskilled; and (8) would the United States be adversely affected in its foreign trade or would foreign nations receive an advantage in the domestic market.

These are important proposals. Their absence from the present legislation, except for the study requirements, do not reflect a negative view towards their advisability. Rather, it reflects a prudent, cautious approach to an important proposal that deserves further serious consideration.

### SECTION-BY-SECTION ANALYSIS

The following section-by-section analysis is an analysis of the sections in the committee amendment, and all references to the bill are references to the committee amendment.

*Section 1. Short title*

This section provides that the Act may be cited as the "Fair Labor Standards Amendments of 1966."

### TITLE I—DEFINITIONS

*Section 101. Tips*

In general, the amendments made by this section provide that an employer of a tipped employee may include a portion of such employee's tips in determining the amount of wages that must be paid such employee to meet the minimum wage requirements of section 6. The computation of the amount which may be included as part of a tipped employee's wages on account of tips is set out in the amendment made by subsection (a) of this section to section 3(m) of the Act, which in its definition of the term "wage" contains a comparable provision relating to the inclusion in the wages of certain employees of the value or cost of board, lodging, or other facilities customarily furnished them. Thus, the wage paid a tipped employee is to be treated as increased on account of tips by an amount determined by his employer which—

   (1) during the first 2 years from the effective date of the Fair Labor Standards Amendments of 1966, may not exceed 35 percent of the applicable minimum wage rate;
   (2) during the third and fourth year from such date, may not exceed 40 percent of such rate; and

(3) during each year thereafter, may not exceed 45 percent of such rate.

However, if the employee (either himself or acting through his representative) can show to the satisfaction of the Secretary that the actual amount of tips received was less than the amount determined by his employer as the amount by which the employee's wage was deemed to be increased, the employee's wage shall be deemed to have been increased by such lesser amount. Consequently, an employer of a tipped employee must pay him at least 65 percent of the applicable minimum wage rate during the period beginning February 1, 1967; 60 percent of such rate during the period beginning February 1, 1969; and 55 percent of such rate beginning February 1, 1971.

The term "tipped employee" is defined in the new subsection (t) added to section 3 of the Act by subsection (b) of this section. Such term is defined to mean any employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips. Thus, only the employer in the occupation in which his employee customarily and regularly receives more than $20 a month in tips may with respect to such employee make the allowances on account of tips provided in the amendment to section 3(m).

*Section 102. Definition of enterprise*

The amendments made by subsection (a) and (b) of this section relate to the inclusion of the activities of hospitals and related institutions, special schools, and institutions of higher education in the definition of the term "enterprise" and consequently to the minimum wage and overtime coverage of their employees. Further, those amendments provide that the activities of any street, suburban or interurban electric railway, or local trolley or motorbus carrier whose rates and services are subject to State or local regulation (hereafter in this analysis of section 102 referred to as a "local transit system") shall be included in the definition of the term "enterprise".

In section 3(r) of the Act the term "enterprise" is defined to mean related activities performed for a common business purpose. Eleemosynary, educational, or similar activities of organizations which are not operated for profit are not included in the term "enterprise" since they are not performed for a business purpose. Thus, such activities of a hospital or similar institution, a school for mentally handicapped or gifted children, or an institution for higher education, which is operated not for profit, would not be considered an enterprise. However, in the amendment to section 3(r) of the Act made by subsection (b) of this section any activity of such a hospital, school, or institution is to be deemed an activity performed for a business purpose. Thus, for example, employees engaged in a hospital's nonprofit activities or employed by a State hospital will now be covered by the minimum wage and overtime provisions of the Act. At present, a publicly operated local transit system is not considered as being operated for a business purpose. However, in the amendment to section 3(r) there is no distinction between a public or private local transit system or a local transit system operated for profit and one operated on a nonprofit basis. Therefore, all the employees of a public local transit system which qualifies as an enterprise engaged in commerce will now be covered by the minimum wage provisions of the Act—an exemption from coverage by the overtime provisions is provided for certain local transit employees.